IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

GINA MARIE CROTTEAU,

                Plaintiff,

  v.

ST. COLETTA OF WISCONSIN,

                Defendant.

OPINION & ORDER

14-cv-652-jdp

---

Plaintiff Gina Marie Crotteau was fired from her job as a "direct support professional" at St. Coletta of Wisconsin, a provider of support services for people with developmental disabilities, run by an order of Catholic nuns. Plaintiff believes she was fired and subjected to a hostile work environment because she is Baptist and because she is over 40 years old. She brings claims under Title VII of the Civil Rights Act and the Age Discrimination in Employment Act (ADEA) against defendant for subjecting her to a hostile work environment and ultimately firing her because of her religion and age. Defendant filed a motion for summary judgment and then supplemented that motion after I allowed plaintiff to add her ADEA claims to the case.

After considering the parties' briefs and supporting evidence, I will grant defendant's motion for summary judgment because defendant is exempt from religious-discrimination claims under Title VII, and because no reasonable jury could conclude on the facts before me that defendant subjected plaintiff to a hostile work environment based on her age or was lying when it explains that it fired plaintiff for leaving clients unattended, rather than because of her age.

UNDISPUTED FACTS

Plaintiff Gina Marie Crotteau is a resident of Jefferson, Wisconsin. Defendant St. Coletta of Wisconsin, Inc. is a non-profit, tax-exempt organization sponsored by the Sisters of St. Francis of Assisi and located in Jefferson. St. Coletta provides residential, day, and vocational programs and services for persons with developmental disabilities and "other challenges."

The Sisters of St. Francis of Assisi is a religious order of the Roman Catholic Church. The Sisters are the sole members of St. Coletta of Wisconsin, Inc., and own all of defendant's assets. Defendant's corporate bylaws specifically require that the corporation's activities be consistent with the "mission, philosophy and values" of the Sisters of St. Francis of Assisi and that the Board of Directors include three members of the Sisters. Defendant's mission statement provides: "Inspired by the Franciscan Values of compassion, dignity and respect, we support persons with developmental and other challenges to achieve their highest quality of life, personal growth and spiritual awareness."

A Catholic mass, attended by residents and employees, is held at the chapel every Thursday, and a recorded mass is available at all times. Prayers are regularly spoken at meetings and in the residents' homes. Symbols of the Catholic religion are located throughout defendant's property, including crucifixes and religious statues depicting the Virgin Mary, St. Francis of Assisi, and St. Colette, among others. The religious nature and operation of defendant's organization is represented to the public in various forms, including on its website.

Plaintiff began working for defendant as a "direct support professional" (DSP). Plaintiff was responsible for providing support to residents (also called clients), who are

individuals with moderate to severe developmental disabilities. These duties included monitoring clients during snack and lunch times to ensure their safety. DSPs are allowed two 15-minute breaks, which are to be taken before and after client programming. If a DSP needs to use the restroom or take an emergency phone call outside of her scheduled break period, she is allowed to do so, but must first arrange for another staff member or a supervisor to be present in her room, or with her clients during the lunch period (during which time everyone is together in the lunchroom), so that that her residents are not left unattended.

Plaintiff generally found it uncomfortable that she could use only her two breaks to use the bathroom. Plaintiff thought lunch time "was the best time to use the restroom since all staff and clients were together in the lunchroom," and "[t]his would not be an issue if there had been any such 15 minute scheduled breaks at any time." Dkt. 44, at 3. Plaintiff states that she "was asked/told several times by staff, who, during lunch, needed to use the restroom," *id*. at 3, and that she "provided coverage for any staff that needed to use the restroom at that time, as well," *id*. at 7.

Defendant's employee handbook states that "if an employee leaves a work area with clients unsupervised, it will result in immediate termination," and that "leaving a client(s) unattended" constitutes serious misconduct and is grounds for immediate termination. The parties dispute whether plaintiff received full training over her first three weeks on the job, but plaintiff does not dispute that she was aware that leaving clients unattended was considered misconduct.

On September 9, 2013, plaintiff was assigned to the Community Room, which had five individuals who required continued monitoring. Defendant says that plaintiff was responsible for two of the individuals. Plaintiff says that she was assigned to the room as an

3

extra staff member, and was allowed to leave the room at least twice to collect supplies and meet with Stephanie McDonald for training.

Defendant says that at some point during lunch, plaintiff left the lunch area (I take the parties to be saying that the staff and clients in the Community Room were part of a larger gathering in the lunch area). McDonald says that employees alerted her to plaintiff's absence. Plaintiff says that her coworkers "were well aware where [she] was at all times." Dkt. 44, at 5. McDonald eventually found plaintiff back in the Community Room. McDonald says she asked plaintiff where she was, plaintiff said that she was at the human resource offices, and McDonald told plaintiff that she needed to be in the lunchroom with her assigned clients during the lunch hour. It is unclear whether plaintiff disputes that she was not in the lunchroom during the entire lunch hour. Plaintiff says that she "completed all [of her] assignments on September 9," *id.*, at 6, which I will construe to mean that plaintiff disputes McDonald's statement that plaintiff left the lunchroom.

On September 10, 2013, plaintiff left the lunchroom to use the bathroom, fax a document, and make a phone call. Plaintiff says that she talked to another staff member before leaving the lunchroom, and "alerted [the] co-worker for any coverage that day before I left the lunchroom." *Id*. at 7. Plaintiff says, "The staff, my co-workers at the time, are very capable and professional persons and would not be compromised by my absence for a short time using the bathroom, nor desperately need one specific staffs' help in the lunch room with the clients."

On September 10, 2013, several employees approached McDonald, reported that plaintiff had been gone for at least 15 minutes and stated that they needed help. McDonald confirmed that plaintiff was not in her work area, ensured that plaintiff's clients were being

4

cared for, and began looking for plaintiff. She asked two other employees to help her: Geralyn Dorn, the manager of Day Programs and Services, and Mario Dealca, the senior director of Programs and Services.

McDonald, Dorn, and Dealca eventually found plaintiff as she was finishing her phone call. McDonald began talking in a raised voice, and plaintiff asked her not to yell at her. Plaintiff "started to feel harassed, as [McDonald] appeared to be losing her temper." McDonald explained to plaintiff that she was not being yelled at, but that she needed to ensure that there was always coverage for the developmentally disabled clients in her care. As McDonald was talking to her, plaintiff walked away. Plaintiff says this is because she "felt that [McDonald] needed a private moment to 'cool down.'" *Id*. at 10. Plaintiff believes that she followed defendant's procedures for ensuring coverage. She was back in her assigned room at 12:30 p.m., when client programming began.

McDonald and Dorn met to discuss plaintiff's continued employment. They say that they decided to fire plaintiff because of plaintiff's behavior that day, her behavior the previous day, and her response to McDonald's criticism. Plaintiff came to work on September 11, 2013, and she was summoned to the human resources office. Dorn and a human resources official met with her. They gave plaintiff a letter saying that she was terminated for leaving several clients unattended.

Plaintiff says that, on some unspecified date, she complained about moldy cabinets and an abusive client in a certain room, and Dorn responded that she would find someone "younger" for that room. Plaintiff also says that "[a]ll staff should not have to endure being ignored, interrupted when speaking, negative attitudes shown towards them, nor hearing "old bitch" muttered under their bosses breath." *Id*., at 12. I take plaintiff to be saying that Dorn

5

was the person who called her an "old bitch."

From January 1, 2013 through September 11, 2013, defendant terminated fourteen direct support professionals in addition to plaintiff. Thirteen of those individuals were under the age of 40. Two of those under-40 DSPs were fired for leaving clients unattended. Plaintiff asserts that shortly following her firing, defendant fired at least three DSPs who were over the age of 40. She lists them as "Dawn[,] Cindy[, and] Beth." *Id*. at 13.

## ANALYSIS

### A. Standard of review

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To avoid summary judgment, plaintiff "must set forth specific facts showing that there is a genuine issue for trial." *Id.* He may not simply rely on the allegations in his pleadings to create such a dispute, but must "demonstrate that the record, taken as a whole, could permit a rational finder of fact to rule in [his] favor." *Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922, 931 (7th Cir. 1996) (citations omitted).

### B. Religion claims

Plaintiff's first set of claims are brought under Title VII of the Civil Rights Act for discrimination and hostile work environment based on her religion. Title VII makes it unlawful for an employer to fail or refuse to hire an individual because of the individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1). It also prohibits

6

employers from "requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993).

However, certain religious employers are exempt from religious-discrimination part of Title VII and may take religion into account in making employment decisions: "This subchapter shall not apply . . . to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion . . . ." Section 2000e–1(a).

Defendant asserts that it is a religious corporation, setting forth a nine-factor test stated by the Third Circuit in collecting cases regarding the religious exemption:

> Over the years, courts have looked at the following factors: (1) whether the entity operates for a profit, (2) whether it produces a secular product, (3) whether the entity's articles of incorporation or other pertinent documents state a religious purpose, (4) whether it is owned, affiliated with or financially supported by a formally religious entity such as a church or synagogue, (5) whether a formally religious entity participates in the management, for instance by having representatives on the board of trustees, (6) whether the entity holds itself out to the public as secular or sectarian, (7) whether the entity regularly includes prayer or other forms of worship in its activities, (8) whether it includes religious instruction in its curriculum, to the extent it is an educational institution, and (9) whether its membership is made up by coreligionists.

*LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 226 (3d Cir. 2007) (citing *Killinger v. Samford University*, 113 F.3d 196 (11th Cir. 1997); *EEOC v. Kamehameha Schools/Bishop Estate*, 990 F.2d 458 (9th Cir. 1993); *EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 618-19 (9th Cir. 1988); *EEOC v. Mississippi College*, 626 F.2d 477 (5th Cir. 1980). It is unnecessary to present a detailed, exhaustive analysis of each of these factors to conclude that defendant is a religious corporation. Given the undisputed facts provided by defendant outlining its ownership and management by the Sisters of St. Francis of Assisi, defendant

qualifies as a "religious corporation" under any reasonable definition of that term, and plaintiff does not argue otherwise. Because defendant qualifies for the religious exemption to Title VII under § 2000e-2(a)(1), I will grant defendant summary judgment on plaintiff's claim that she was discriminatorily terminated by defendant.

This exemption likely also applies to claims for hostile work environment based on religion. *See Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 194 (4th Cir. 2011) (concluding that religious nursing-care facility exempt from religious harassment and retaliation claims by former employee). But even if the exemption did not apply, I would grant summary judgment to defendant on plaintiff's religious hostile work environment claim because plaintiff does not provide sufficient evidence to support that type of a claim. To prove a hostile work environment claim, a plaintiff must show: (1) the work environment was both subjectively and objectively offensive; (2) the protected status was the cause of the harassment; (3) the conduct was severe or pervasive; and (4) there was a basis for employer liability. *Chaib v. Ind.*, 744 F.3d 974, 985 (7th Cir. 2014).

In her complaint, plaintiff stated that Geralyn Dorn's demeanor toward plaintiff changed markedly and she treated her rudely after she found out that plaintiff was Baptist. But at summary judgment, plaintiff does not provide proposed findings of fact reiterating this story or explaining much about Dorn's behavior. All plaintiff provides in support of a hostile work environment claim is a statement that Stephanie McDonald raised her voice at plaintiff to reprimand her after her second day leaving her post, and a statement that "[a]ll staff should not have to endure being ignored, interrupted when speaking, negative attitudes shown towards them, nor hearing "old bitch" muttered under their bosses breath." Dkt. 44, at 12. I take plaintiff to be saying that Dorn called her an "old bitch."

This comes nowhere close to showing that the work environment was severely or pervasively offensive. "[O]ffhand comments, and isolated incidents (unless extremely serious)" are not sufficient to support a hostile work environment claim. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks omitted). Nor does plaintiff provide any evidence that Dorn or McDonald acted the way they did because plaintiff was a Baptist. Because no reasonable jury could conclude that plaintiff could meet the elements of a hostile work environment claim, summary judgment must be granted to defendant.

## C. Age claims

Plaintiff also brings claims for discriminatory termination and hostile work environment under the ADEA. The ADEA prohibits employers from refusing to hire workers who are 40 or older on the basis of their age. 29 U.S.C. §§ 623(a)(1), 631(a). On its own terms, the religious exemption to Title VII discussed above does not apply to ADEA claims of age discrimination, and defendant does not argue that it should be exempt from the ADEA claims.

### 1. Discriminatory termination

As with Title VII claims, a plaintiff suing under the ADEA may show discrimination by using either the "direct" or the "indirect" methods of proof. *Van Antwerp v. City of Peoria, Ill.*, 627 F.3d 295, 297 (7th Cir. 2010). The question under either method is whether plaintiff can show that a reasonable jury could find that defendant unlawfully discriminated against her. *Simpson v. Beaver Dam Cmty. Hosps., Inc.*, 780 F.3d 784, 790 (7th Cir. 2015). Plaintiff must produce evidence from which a jury could infer that her age "was a but-for cause of [her] termination." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009).

Under the direct method, plaintiff may present either direct or circumstantial evidence of discrimination. *Tank v. T–Mobile USA, Inc.*, 758 F.3d 800, 805 (7th Cir. 2014). Evidence that proves a claim under the direct method typically includes:

> (1) suspicious timing, ambiguous oral or written statements, or behavior toward, or comments directed at, other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; or (3) evidence that the employer offered a pretextual reason for an adverse employment action.

*Id*.

Plaintiff does not present any direct evidence that defendant admitted to discriminating against her. The circumstantial evidence she provides is extremely thin. In her complaint and again in her briefing, plaintiff states that she and other older employees received "unfounded" reprimands that younger employees did not receive, but she fails to present findings of fact or supporting evidence that details these events, so I cannot credit that assertion. Plaintiff also references a couple of comments by Dorn: she says that, on some unspecified date, she complained about moldy cabinets and an abusive client in a certain room, and Dorn responded that she would find someone "younger" for that room. And as stated above, I take her to be saying that on an unspecified date, Dorn called her an "old bitch" under her breath. Also, plaintiff contends that "[t]here were several DSP's over age 40 that were terminated after me. Dawn, Cindy, and Beth are three that I know of." Dkt. 40, at 2.

Dorn's comments are not enough to show that defendant fired her because of her age. "[I]solated comments that are no more than 'stray remarks' in the workplace are insufficient to establish that a particular decision was motivated by discriminatory animus." *Merillat v.*

*Metal Spinners, Inc.*, 470 F.3d 685, 694 (7th Cir. 2006). A particular remark *can* provide an inference of discrimination when the remark was (1) made by the decision maker, (2) around the time of the decision, and (3) in reference to the adverse employment action. *Id*. Plaintiff at most proves one of these points—Dorn was a decision maker regarding her termination. But plaintiff does not explain when Dorn made these remarks, and it is clear from the proposed findings that she did not make these remarks in conjunction with the events surrounding plaintiff's termination.

As for plaintiff's assertion that defendant fired other workers over 40 (Dawn, Cindy, and Beth) after she was fired, defendant produces more complete information refuting plaintiff's implication that defendant fired only older employees.[1] Defendant's records show that in the nine months preceding plaintiff's termination, 13 of the 15 DSPs fired by defendant were under 40. Two of those under-40 DSPs were fired for leaving clients unattended. Given this more complete information showing that defendant fires DSPs of all ages, I do not consider the firing data to add much to plaintiff's direct case that defendant intended to fire her based on her age. Even taken together with the alleged comments by Dorn, she falls far short of producing evidence creating a "convincing mosaic of circumstantial evidence" sufficient to permit a jury to infer that discrimination motivated her termination. *Anderson v. Donahoe*, 699 F.3d 989, 996 (7th Cir. 2012).

Plaintiff fairs no better under the indirect method of proof. Under this method, I apply the burden-shifting framework articulated in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802 (1973). To prove that defendant discriminated against her, plaintiff must

---

[1] Defendant provides employment records indicating that Elizabeth "Beth" Vogel was actually 39 when she was fired. For purposes of summary judgment I will consider this fact disputed and credit plaintiff's assertion that Vogel was over 40.

make a *prima facie* case with evidence that: (1) she is a member of a protected class (i.e., over 40); (2) she met defendant's legitimate job expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of the protected class were treated more favorably. *Tubergen v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 517 F.3d 470, 475 (7th Cir. 2008).

Plaintiff meets the first and third elements by stating that she is over 40 and that she was terminated from her job. That leaves the issues of defendant's legitimate job expectations and her treatment compared to similarly situated employees outside of her protected class. These issues are closely tied to the question whether defendant's proffered reason for terminating plaintiff was a pretext to cover defendant's true discriminatory purpose. "[T]o show pretext, a plaintiff must show that (1) the employer's non-discriminatory reason was dishonest and (2) the employer's true reason was based on a discriminatory intent.'" *Stockwell v. City of Harvey*, 597 F.3d 895, 901 (7th Cir. 2010) (quoting *Fischer v. Avanade, Inc.*, 519 F.3d 393, 403 (7th Cir. 2008)). Because these issues are so closely related, I will consider them together. *See Senske v. Sybase, Inc.*, 588 F.3d 501, 507 (7th Cir. 2009) ("[T]he question of whether he was meeting Sybase's legitimate expectations merges with the question of whether Sybase's reasons for firing Senske are pretextual.").

From an objective standpoint, it is difficult to tell whether plaintiff actually met defendant's expectations. It was clearly forbidden for plaintiff to leave clients "unsupervised" or "unattended," but plaintiff contends that she never left her clients *completely* unattended because there were other staff members present in the lunchroom. To some degree, it may have been a misunderstanding between plaintiff's belief that she did not leave her clients

completely unattended, whereas defendant's position was that plaintiff left clients specifically assigned to her or that plaintiff's absence left the client-to-staff ratio too high.

But ultimately, it does matter whether defendant's interpretation of plaintiff's conduct was precisely correct under the terms of the discipline policy. Federal courts "do not sit as super personnel departments, second-guessing an employer's facially legitimate business decisions." *Ajayi v. Aramark Bus. Servs.*, 336 F.3d 520, 532 (7th Cir. 2003). *See also Yindee v. CCH Inc.*, 458 F.3d 599, 602 (7th Cir. 2006) ("It is not enough to demonstrate that the employer was mistaken, inconsiderate, short-fused, or otherwise benighted . . . . Poor personnel management receives its comeuppance in the market rather than the courts." (internal citations omitted)).

Rather, plaintiff must present evidence showing that defendant discriminated against her because of her age, which in this case entails showing that defendant's explanation was a lie and that the true reason was discriminatory intent. Plaintiff attempts to do this by showing that she was treated differently than younger employees. "This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000).

Plaintiff states that she "was asked/told several times by staff, who, during lunch, needed to use the restroom," *id*. at 3, and that she "provided coverage for any staff that needed to use the restroom at that time, as well," *id*. at 7. Even taking these statements to mean that it was not unusual for employees to use the bathroom at lunch so long as they got another employee to cover for them, they are too vague to show that defendant treated

13

plaintiff differently because of her age. Plaintiff does not explain whether the other employees' job duties were the same as her, whether they arranged for coverage during their breaks the same way as plaintiff, whether the other employees who were able to use the bathroom were under or over the age of 40, or whether McDonald or Dorn were aware of these other incidents yet did nothing to punish the other employees.

Plaintiff also refers to the firing of other over-40 DSPs following her termination, but as I stated above regarding the direct method, the fuller picture of the termination data shows that defendant fired DSPs of all ages. I cannot infer from this data that older employees were treated worse.

Plaintiff gives other reasons for her behavior—that she was not fully trained or that defendant's rules and her duties during lunch made it very difficult to find time to use the bathroom, and she was not allowed to present her side of the story to human resources before she was terminated. But her ADEA termination claim is not about whether defendant's rules were generally fair to the employees or wise, it is about whether defendant fired for because of her age. Because plaintiff fails to provide evidence that could lead a reasonable jury to conclude that she was fired because of her age, I will grant summary judgment to defendant on this claim.

2. **Hostile work environment**

Defendant contends that plaintiff's hostile work environment claim under the ADEA should be dismissed because she failed to properly exhaust that claim with the EEOC. To bring an ADEA claim in federal court, a plaintiff must first have raised it in a timely EEOC charge. 29 U.S.C. § 626(d) ("No civil action may be commenced by an individual under this

section until 60 days after a charge alleging unlawful discrimination has been filed with the [EEOC]."); *Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 527 (7th Cir. 2003).

Plaintiff did file an EEOC charge about her *termination*, but generally, a plaintiff may not bring an ADEA claim that is beyond the scope of the underlying EEOC charge. *Kristufek v. Hussmann Foodserv. Co.*, 985 F.2d 364, 368 (7th Cir. 1993); *Hewitt v. Metro. Water Reclamation Dist. of Greater Chicago*, No. 01 C 9218, 2002 WL 31176252, at *6 (N.D. Ill. Sept. 30, 2002). Defendant contends that the plaintiff's charge was insufficient to present a hostile work environment claim to the EEOC. In particular, defendant cites to a Title VII case explaining that the plaintiff could not bring a hostile work environment charge with only vague allegations of wrongdoing:

> Hottenroth claims that she was yelled at, that she was upset by her co-workers and Lange, and that she felt threatened on three separate occasions. However, these allegations fall far short of describing an environment that is so "severe or pervasive as to create an abuse working environment." . . .
>
> * * *
>
> In her complaints, Hottenroth alleges no specific evidence of anything which could reasonably be considered either objectively or subjectively hostile. If this court were to hold otherwise, any complainant, who at any time filed any manner of claim with the EEOC, could collaterally attack an adverse ruling on hostile work environment grounds.

*Hottenroth v. Vill. of Slinger*, 388 F.3d 1015, 1035 (7th Cir. 2004) (citations omitted).

Although *Hottenroth* is a Title VII case, it stands to reason that a similar exhaustion analysis should apply to hostile work environment claims brought under the ADEA. Plaintiff's ADEA charge falls far short of articulating the basis for a hostile work environment charge. She says virtually nothing about the circumstances behind her termination, stating only that she was fired after making a complaint, and that she believed she was fired because

of her age and religion. She provided no allegation about being subjected to a hostile work environment. Therefore, I conclude that summary judgment should be granted to defendant on this claim because plaintiff failed to exhaust her administrative remedies.

Even if I were to ignore plaintiff's failure to file a charge articulating a hostile work environment claim, I would grant summary judgment to defendant on the merits of her claim for much the same reason I granted summary judgment regarding the religion-based hostile work environment claim. At best, plaintiff has provided a couple of offhand comments that are insufficient to show that the workplace was severely or pervasively offensive.

ORDER

IT IS ORDERED that:

1. Defendant St. Coletta of Wisconsin's motion for summary judgment, Dkt. 14 & 30, is GRANTED.

2. The clerk of court is directed to enter judgment in favor of defendant and close this case.

Entered August 3, 2016.

BY THE COURT:

/s/
_____
JAMES D. PETERSON
District Judge